**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CYNTHIA DIXON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 17 C 8033** |
| ) | |
| **THE WASHINGTON AND JANE SMITH** ) | |
| **COMMUNITY — BEVERLY d/b/a** ) | |
| **SMITH SENIOR LIVING, SMITH CROSSING,** ) | |
| **and SMITH VILLAGE, KEVIN MCGEE,** ) | |
| **MARTI JATIS, and KRONOS, INC.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Cynthia Dixon, a former employee of Smith Senior Living (Smith), has sued Smith and Kronos, Inc. on behalf of herself and a putative class of similarly situated individuals. Dixon asserts claims for negligence and violation of Illinois's Biometric Information Privacy Act (BIPA) arising from Smith's requirement that its employees clock in and out of work by scanning their fingerprints onto a biometric timekeeping device (Kronos is the third-party supplier of the fingerprint scanners used by Smith). Dixon also has brought claims against Smith and two individuals[1]—Kevin McGee, the CEO of Smith Senior Living, and Marti Jatis, the Executive Director of Smith Village—for violating the Illinois Minimum Wage Law (IMWL) and the Illinois Wage Payment and Collection Act (IWPCA) and for retaliatory discharge. Dixon initially filed this lawsuit in

---

[1] Collectively, "the Smith defendants."

the Circuit Court of Cook County, Illinois, and Kronos removed the case to federal court

in November 2017.  Kronos and the Smith defendants have filed separate Rule 12(b)(6)

motions to dismiss, and Dixon, for her part, has moved to remand the case to state

court.  For the reasons stated below, the Court denies Dixon's motion to remand and

Kronos's motion to dismiss.  The Court grants the Smith defendants' motion to dismiss

in part and denies it in part.

## Background

**A.     Background on class action claims**

The Court takes the following facts from Dixon's complaint.  Dixon worked at

Smith Senior Living[2] from February 20, 2017 until September 5, 2017.  Smith required

---

[2] Dixon appears to be operating under the belief that Smith Senior Living, Smith Crossing, and Smith Village are owned and operated by the same corporation.  In the caption of the complaint, Dixon names as a defendant "The Washington and Jane Smith Community – Beverly, an Illinois Not-For-Profit Corporation d/b/a Smith Senior Living, Smith Crossing, and Smith Village."  Compl. at 1.  Elsewhere in the complaint, she refers to "The Washington and Jane Smith Home . . . d/b/a Smith Senior Living, Smith Crossing, and Smith Village (collectively 'Smith')."  *Id.*  It appears, however, that neither The Washington and Jane Smith Community – Beverly nor The Washington and Jane Smith Home does business as Smith Senior Living, Smith Crossing, *and* Smith Village.  According to the Illinois Secretary of State's official webpage, Smith Village is registered to Washington and Jane Smith Community – Beverly, Smith Crossing is registered to Washington and Jane Smith Community – Orland Park, and Smith Senior Living is registered to The Washington and Jane Smith Home.
https://www.ilsos.gov/corporatellc/CorporateLlcController (last visited May 16, 2018) (enter "Washington and Jane Smith" as the search term); *see Laborers' Pension Fund v. Blackmore Sewer Const., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002) (taking judicial notice of matters of public record).  The complaint does not clearly set out the relationship between Smith Senior Living, Smith Crossing, and Smith Village.  Dixon alleges that she "worked for Smith's facility doing business as 'Smith Senior Living,'" Compl. ¶ 36, yet she also alleges that Marti Jatis, the Executive Director of Smith Village, was one of her supervisors.  *Id.* ¶¶ 13, 55.  The fact that Dixon refers to all of these entities collectively as "Smith" throughout the complaint and briefs does nothing to alleviate the confusion.  Because Dixon has not alleged that she worked anywhere other than Smith Senior Living, the Court will assume for purposes of this opinion that all references to "Smith" pertain to Smith Senior Living unless otherwise stated.

Dixon to clock in and out of work by scanning her fingerprint, which Smith stored in a database after the first time it was scanned. Smith did not inform Dixon of the specific purpose or length of time for which her fingerprint was to be collected, stored, and / or used. Nor did Smith make available information about its biometric data retention policy (if it had such a policy) or other guidelines regarding the permanent destruction of the biometric information it possessed. Smith also neglected to obtain a written release from Dixon authorizing Smith to collect or store her fingerprints. Lastly, Dixon alleges that, in addition to collecting and storing her biometric information, Smith also "systematically disclosed" that information to Kronos, the out-of-state, third-party vendor of Smith's biometric time clocks, without informing her that it was doing so. Compl. ¶¶ 97, 30. For its part, Kronos did not obtain a written release from Dixon authorizing it to collect or store her fingerprints, nor did it inform her of the specific purpose or length of time for which it would store that information. Kronos also failed to provide information on its biometric data retention policy. As a result of these shortcomings, Dixon alleges that both Smith and Kronos "fail[ed] to implement reasonable procedural safeguards around the collection and use" of her biometric information, as well as that of other Smith employees. *Id.* ¶ 105.

**B.** **Background on individual claims**

During her employment with Smith Senior Living, Dixon typically worked about sixty hours per week, and she was paid approximately $16.44 per hour. In April 2017, Dixon was given a number of additional duties as a result of Smith's Environmental Services Manager being placed on a performance improvement plan. Dixon began receiving after-hours e-mails, text messages, and calls from her supervisors, Ashley

Castro and Marti Jatis, as well as from employees on the Environmental Services team. Despite the increase in Dixon's on- and off-the-clock responsibilities, her title and pay did not change, though Castro and Chris August, Smith's Corporate Environmental and Safety Director, did agree to reimburse Dixon for her work-related cell phone charges.

In or around June 2017, Smith required Dixon to become trained and certified by the Federal Emergency Management Agency (FEMA) and to prepare presentations for Smith's Emergency Preparedness Committee. Dixon estimates that she worked approximately 100 to 200 hours of unpaid overtime to complete the FEMA training and certification and prepare the Committee presentations.

In July 2017, Smith demoted the Environmental Services Manager who had been on the performance improvement plan and assigned his duties to Dixon. These additional duties included scheduling and supervising the Environmental Services team. As a result—and because Smith designated Dixon as the person other employees should call if they encountered a problem after business hours—Dixon frequently received and responded to calls, e-mails, and text messages from her supervisor and members of the Environmental Services team after hours. Prior to August 30, 2017, Dixon informed her supervisors of the work she was performing, but not being paid for, after the end of her shift. Her supervisors "approved of this time and guaranteed reimbursement." *Id.* ¶ 118.

On August 30, 2017, Smith formally offered Dixon the Environmental Services Manager job—a salaried position that paid $43,000 a year. The next day, Dixon sent an e-mail to Castro and Jatis in which she challenged whether she could be properly classified as an "exempt" employee if she was paid a $43,000-a-year salary. On

September 1, Dixon had a meeting with her supervisor (presumably Castro), Marti Jatis, and Karen Jellema from human resources.  Dixon was told that she would receive answers to her questions about the position and her salary on September 5, after the holiday weekend.  On September 5, however, Smith terminated Dixon's employment.  Dixon was told that her department was being restructured and that she was being terminated for twice working past the end of her shift.  Jellema also told Dixon that Dixon was "wrong" regarding the salary threshold for "exempt" employees.  Compl. ¶ 71.  Smith never paid Dixon for the estimated 100 to 200 hours of overtime she worked on her FEMA and other emergency preparedness duties, nor did it pay her for the additional overtime she worked responding to after-hours communications from supervisors and Environmental Services staff.  Moreover, although Smith previously had reimbursed Dixon for cell phone charges from April 2017 through June 2017, Dixon did not receive any reimbursement for the work-related cell phone expenses she incurred from July 2017 until her termination in September 2017.

## C.    Procedural history

In September 2017, Dixon filed suit against Smith Senior Living, Smith Crossing, Smith Village,[3] McGee, Jatis, and Kronos in the Circuit Court of Cook County.  She asserted the following six claims in her complaint:

> (1) Violations of Illinois's Biometric Information Privacy Act (against Smith and Kronos on behalf of Dixon and a putative class);
>
> (2) Negligence (against Smith and Kronos on behalf of Dixon and a putative class);
>
> (3) Failure to pay minimum wage and overtime for all hours worked, in violation of the Illinois Minimum Wage Law (against Smith, McGee, and

---

[3] *See supra* note 2.

Jatis on behalf of Dixon individually);

(4) Retaliation in violation of the Illinois Minimum Wage Law (against Smith, McGee, and Jatis on behalf of Dixon individually);

(5) Violation of the Illinois Wage Payment and Collection Act (against Smith, McGee, and Jatis on behalf of Dixon individually); and

(6) Retaliatory discharge (against Smith on behalf of Dixon individually).

*See* Compl. at 17-24. With the consent of the Smith defendants, Kronos removed the case to federal court pursuant to the Class Action Fairness Act of 2005 (CAFA) in November 2017. In December 2017, Kronos and the Smith defendants filed separate motions to dismiss the suit under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Kronos argues that the Court should dismiss the BIPA claim because Dixon has not alleged an injury sufficient to make her a person "aggrieved" under the Act. Kronos also has moved to strike Dixon's request for liquidated damages under BIPA. Kronos further contends that Dixon has failed to state a claim for negligence. Like Kronos, the Smith defendants argue that Dixon has not sufficiently alleged that she is a person aggrieved under BIPA and that she has not alleged an injury that would support a common law negligence claim. Additionally, they contend that Smith Village and Smith Crossing should be dismissed because Dixon does not allege that she worked for Smith Village or Smith Crossing, nor does she allege any facts that would render either entity liable for the violations alleged in the complaint. The Smith defendants likewise argue for dismissal of the claims against McGee and Jatis on the ground that Dixon has not alleged facts sufficient to establish their individual liability, as employers, for the IMWL and IWPCA violations alleged. Lastly, Smith contends that Dixon's IMWL, IWPCA, and retaliatory discharge claims fail to state a claim upon which relief can be granted.

In response, Dixon has filed a motion to remand the case to state court. According to Dixon, remand is warranted on the ground that the defendants' arguments for dismissal cast doubt on the existence of Article III standing and, consequently, on the Court's jurisdiction over the case.

The Court will address Dixon's motion to remand before proceeding to the merits of the defendants' motions to dismiss.

## Discussion

### A.      Motion to remand

Dixon contends that, by arguing in their motions to dismiss that she has not alleged an injury sufficient to make her a person aggrieved under BIPA, the defendants have effectively asserted that she does not meet the injury-in-fact requirement for Article III standing. Because Article III standing is a necessary component of federal jurisdiction—and because it is the burden of the party that removed the case to federal court to establish jurisdiction—Dixon asserts that the Court must remand the case to the Circuit Court of Cook County in light of the defendants' failure to meet that burden.

Pursuant to Article III of the U.S. Constitution, federal jurisdiction is limited to actual cases or controversies. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016). To ensure that this case-or-controversy limitation is respected, the Supreme Court has defined an "irreducible constitutional minimum of standing" that litigants who are seeking to avail themselves of the federal courts must meet. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To meet those minimum requirements— that is, to have Article III standing to sue in federal court—"a plaintiff must have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the

defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017) (quoting *Spokeo*, 136 S. Ct. at 1547). The party or parties asserting federal jurisdiction bear the burden of establishing that "all elements of jurisdiction—including Article III standing—existed at the time of removal." *Collier v. SP Plus Corp.*, No. 17-2431, 2018 WL 2186786, at *2 (7th Cir. May 14, 2018) (per curiam); *see also Taylor*, 875 F.3d at 853; *Ne. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 707 F.3d 883, 893 (7th Cir. 2013). If, after a case has been removed to federal court, it appears that the federal district court lacks subject matter jurisdiction, it must remand the case to state court. 28 U.S.C. § 1447(c).

Here, because the defendants removed the suit to federal court, it is the defendants who bear the burden of establishing federal jurisdiction, which includes Article III standing.[4] *See Collier*, 2018 WL 2186786, at *2. Defendants concede that they would bear the burden of establishing subject matter jurisdiction if Dixon challenged it by affirmatively arguing that she lacked Article III standing. They argue, however, that this burden has not been triggered because neither party has raised a challenge to subject matter jurisdiction: defendants do not contend that Dixon lacks Article III standing, and Dixon herself takes no position on the matter, beyond asserting that the defendants have effectively called it into question. Specifically, Dixon asserts

---

[4] Any argument to the contrary, including the district court's attempt to separate the issue of Article III standing from subject matter jurisdiction in *Raqqa, Inc. v. Northstar Lottery Group, LLC*, No. 17-CV-246-MJR-DGW, 2018 WL 1366619, at *1 (S.D. Ill. Mar. 16, 2018), and the defendants' attempt to rest on the fact that they met the requirements for original jurisdiction under CAFA, is foreclosed by the Seventh Circuit's decision in *Collier*. *See Collier*, 2018 WL 2186786, at *2 ("But reliance on the phrase 'original jurisdiction' is not enough, because federal courts have subject-matter jurisdiction only if constitutional standing requirements also are satisfied.").

that the defendants have cast doubt on federal jurisdiction by arguing for dismissal of her complaint on the ground that the procedural injuries she has alleged are insufficient to support a cause of action under BIPA or a negligence claim. According to Dixon, this argument, "though ostensibly aimed at the meaning of 'aggrieved' in BIPA, directly question[s] whether [she] has alleged a 'cognizable injury,'" which is a requirement for Article III standing and, thus, federal jurisdiction. Pl.'s Mot. to Remand at 3; *see also* Pl.'s Reply in Supp. of Mot. to Remand at 6 ("Defendants' motions to dismiss are jurisdictional motions dressed up as motions for failure to state a claim, undoubtedly because Defendants know that improper removal is sanctionable conduct.").

It is true that the defendants do not expressly challenge Dixon's Article III standing in their motions to dismiss. But it also is true that the cases upon which defendants rely to support their argument that Dixon's alleged injuries are insufficient to render her a "person aggrieved" under BIPA also address whether the injury is sufficient for Article III standing purposes. *See Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1112-18 (9th Cir. 2017); *Gubala v. Time Warner Cable, Inc.*, 846 F.3d 909, 911-13 (7th Cir. 2017); *Monroy v. Shutterfly, Inc.*, No. 16 C 10984, 2017 WL 4099846, at *8 n.5 (N.D. Ill. Sept. 15, 2017); *Vigil v. Take-Two Interactive Software, Inc.*, 235 F. Supp. 3d 499, 507-19 (S.D.N.Y. Jan. 27, 2017), *aff'd in part, vacated in part, remanded sub nom. Santana v. Take-Two Interactive Software, Inc.*, 717 F. App'x 12 (2d Cir. 2017); *McCollough v. Smarte Carte, Inc.*, No. 16 C 03777, 2016 WL 4077108, at *2-4 (N.D. Ill. Aug. 1, 2016). Regardless of whether the defendants intended to cast doubt on Dixon's Article III standing, it takes no great leap of imagination to read the above-mentioned cases, along with the defendants' repeated assertions that Dixon has alleged nothing more

than "a bare procedural violation of BIPA," Kronos's Mem. in Supp. of Mot. to Dismiss (Kronos's Mot. to Dismiss) at 10, and begin to wonder whether Dixon has, in fact, alleged an injury sufficient to confer Article III standing. *See Monroy*, 2017 WL 4099846, at *8 n.5 ("The court notes that, in addition to *McCollough*, *Vigil* . . . also dismissed a BIPA suit after concluding that the plaintiffs were unable to satisfy Article IIIc's injury-in-fact requirement. Although Shutterfly has not challenged Monroy's standing in this case, the court has an independent obligation to assure itself of its jurisdiction.").

In light of the Court's independent obligation to ensure that it has subject matter jurisdiction, the defendants' suggestion that they bear no burden to establish Article III standing unless it is affirmatively challenged is beside the point. *See Smith v. Am. Gen. Life & Acc. Ins. Co.*, 337 F.3d 888, 892 (7th Cir. 2003) ("This court has an independent obligation to satisfy itself that federal subject matter jurisdiction exists before proceeding to the merits in any case, even where, as here, neither the parties nor the district court has questioned the existence of such jurisdiction."); *Cook v. Winfrey*, 141 F.3d 322, 325 (7th Cir. 1998) ("[O]nce the district judge has reason to believe that there is a serious jurisdictional issue, he [or she] is obliged to resolve it before proceeding to the merits even if the defendant, whether as a matter of indolence or strategy, does not press the issue.") (citation omitted). There is no question that defendants bear the burden of establishing federal jurisdiction, which they invoked when they removed the case to federal court. *See Lujan*, 504 U.S. at 561 ("[t]he party invoking federal jurisdiction bears the burden of establishing" Article III standing); *Collier*, 2018 WL 2186786, at *2. The real question is whether the fact that the defendants bear that burden means, as Dixon

contends, that their failure to argue in favor of federal jurisdiction requires the Court to remand the case to state court without deciding the issue of Article III standing.

Dixon argues that this Court need not decide the question of subject matter jurisdiction one way or the other; instead, she contends that because it is the defendants' burden to establish jurisdiction, the case must be remanded to state court because the defendants have not attempted to meet their burden to show it exists. In support of this argument, Dixon points to four recent cases in which other judges in this district granted similar motions to remand without deciding the underlying jurisdictional issue.

In *Mocek v. Allsaints USA Ltd.*, 220 F. Supp. 3d 910 (N.D. Ill. 2016), the defendant in a putative class action alleging violations of the Fair and Accurate Credit Transactions Act (FACTA) removed the case to federal court pursuant to 28 U.S.C. § 1441 and CAFA. *Id.* at 911; *see* Notice of Removal, *Mocek v. Allsaints USA Ltd.*, No. 16 C 8484 (N.D. Ill. Oct. 30, 2016), ECF No. 1. After removal, the defendant moved to dismiss for lack of federal jurisdiction on the ground that the plaintiff failed to satisfy Article III's injury-in-fact standing requirement. *Mocek*, 220 F. Supp. 3d at 911. The plaintiff then moved to remand the case to state court based on the defendant's "affirmative disavowal of jurisdiction." *Id.* The district court granted the plaintiff's motion to remand without deciding whether the plaintiff had Article III standing, because both parties agreed that federal jurisdiction was lacking. *Id.* at 912. The court went on to note that remand also was warranted based on the fact that the defendant admitted that Article III standing in the context of FACTA was "unsettled" after *Spokeo*; the court explained, "That consideration alone supports remand, as '[a]ny doubt regarding

jurisdiction should be resolved in favor of the states.'" *Id.* at 913 (quoting *Doe v. Allied-Signal, Inc.*, 985 F.2d 908, 911 (7th Cir. 1993)) (alterations in original). The court concluded that, "with no party willing to overcome the presumption against federal jurisdiction," remand was "appropriate on any analysis." *Id.* at 914.

In *Barnes v. ARYZTA, LLC*, 288 F. Supp. 3d 834 (N.D. Ill. 2017), the plaintiff filed a class-action lawsuit alleging negligence and violations of BIPA in state court. *Id.* at 835. After removing the case to federal court pursuant to CAFA, the defendant filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6). *Id.* at 835-36. In this motion to dismiss, the defendant argued that subject matter jurisdiction was lacking because the plaintiff had not alleged a concrete injury in fact sufficient for Article III standing under *Spokeo*. *Id.* at 836. The defendant later moved to withdraw this motion and was granted leave to file an amended one that left out the subject matter jurisdiction argument and instead raised only Rule 12(b)(6) grounds for dismissal. *Id.* The plaintiff then filed a motion to remand the case to state court. *Id.* Drawing heavily on *Mocek*, the district court granted the motion to remand without deciding whether there was Article III standing because the defendant, who bore the burden of proof on the matter, did not attempt to persuade the court that federal jurisdiction existed:

> The Court declines to decide whether there is Article III standing because neither party is willing to address the issue. On the one hand, Plaintiff seeks remand to the state court and therefore does not want to argue to this Court it has sustained a concrete injury-in-fact because then it would be conceding subject matter jurisdiction in federal court. Defendant, on the other hand, would like to argue that Plaintiff has *not* sustained an Article III injury but has withdrawn any argument to that effect in a ploy to avoid being forced out of federal court. *The difference between the two parties is that Plaintiff does not have to take a position on the standing issue while Defendant does, because Defendant bears the burden of establishing jurisdiction in this Court*.

*Id.* at 839 (second emphasis added). The court went on to note, again citing *Mocek*, that the defendant's admission that the issue of Article III standing was unsettled with respect to claims brought under BIPA was an alternative ground for remanding the case to state court. *Id.*

*Roberts v. Dart Container Corp. of Illinois*, No. 17 C 9295, dkt. no. 22 (N.D. Ill. Mar. 12, 2018), also involved a BIPA-based class action lawsuit that the defendant removed to federal court pursuant to CAFA. *Id.* at 1. In that case, the defendant filed a Rule 12(b)(1) motion to dismiss based on lack of subject matter jurisdiction (Article III standing), and—unlike in *Barnes*—it did not later seek to withdraw that motion. *Id.* The plaintiff moved to remand to state court on the basis that, by affirmatively challenging Article III standing, the defendant failed to meet its burden to establish federal jurisdiction. *Id.* Citing *Barnes* and *Mocek*, the district court granted the plaintiff's motion to remand because the parties were "in 'agreement' that subject-matter jurisdiction [was] lacking." *Id.* at 2.

*Mocek*, *Barnes*, and *Roberts* are all distinguishable from the present case. In each of those cases, the defendants "tried to have it both ways by asserting, then immediately disavowing, federal jurisdiction" by expressly arguing that the plaintiff lacked Article III standing (even though the defendant in *Barnes* subsequently withdrew its jurisdictional challenge). *Mocek*, 220 F. Supp. 3d at 914. The defendants in the present case have made no such challenge to federal jurisdiction. At least one court in this district has concluded, however, that remand is warranted even if the defendant does not directly challenge jurisdiction, but merely casts doubt on it. *See Zhirovetskiy v. Zayo Group, LLC*, No. 17 C 5876, dkt. no. 49 (N.D. Ill. Mar. 7, 2018) (Coleman, J.). In

*Zhirovetskiy*, another putative BIPA class action that was originally filed in state court and removed to federal court pursuant to CAFA, the defendant moved to dismiss the suit under Rule 12(b)(6) for the same reason the defendants in the present case have moved for dismissal: it contended that the plaintiff had not alleged an injury in fact that would render him a "person aggrieved" under BIPA. *Id.* at 1-2. The plaintiff moved for remand to state court on the ground that the defendant's argument cast doubt on the existence of Article III standing and, consequently, federal jurisdiction. *Id.* at 1. Although the defendant did not directly challenge subject matter jurisdiction, the district court concluded that "the spirit" of the argument did, "given the effect that questioning the 'injury-in-fact' element has on federal standing." *Id.* at 3. Because it was the defendant's burden, as the party that removed the case to federal court, to establish jurisdiction—and because the court considered the defendant to have called jurisdiction into question by arguing that the plaintiff did not allege a cognizable harm—the court concluded that remand was appropriate, as in *Barnes*. *Id.* In reaching this conclusion, the court cited the same principle invoked in *Mocek* and *Barnes*: "Federal courts should interpret the removal statute narrowly, resolving any doubt in favor of the plaintiff's choice of forum in state court." *Id.* (quoting *Schur v. L.A. Weight Loss Centers, Inc.*, 577 F.3d 752, 758 (7th Cir. 2009)) (alterations omitted).

This Court is taking a different approach from the court in *Zhirovetskiy*. First, there is no presumption against removal in cases that are removed under CAFA. *See Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 554 ("We need not here decide whether . . . a presumption [against removal] is proper in mine-run diversity cases. It suffices to point out that no antiremoval presumption attends cases invoking

CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court."); *see also Sabrina Roppo v. Travelers Commercial Ins. Co.*, 869 F.3d 568, 578 n.22 (7th Cir. 2017) (no presumption against removal in cases invoking CAFA). *Schur* and *Doe v. Allied-Signal*—the Seventh Circuit cases to which *Mocek*, *Barnes*, and *Zhirovetskiy* cite for the proposition that courts should resolve doubts in favor of the plaintiff's choice of forum—did not involve removal pursuant to CAFA. In the absence of a presumption against removal, the defendants' admission that the law on standing to sue for BIPA violations is unsettled in the wake of *Spokeo* does not compel the Court to remand the case to state court.

Nor does the defendants' unwillingness to make an affirmative argument in favor of Article III standing mean that the Court must (or should) remand the case to state court without determining for itself whether standing exists. Although *Collier* dealt with a situation more analogous to that of *Mocek* and *Roberts* than the one presented here, the Seventh Circuit's recent decision in that case is nonetheless instructive on this point, and it suggests that the appropriate course of action is to go ahead and decide the threshold issue of standing. *See Collier*, 2018 WL 2186786, at *1-2.

Although the case was not removed to federal court pursuant to CAFA, *Collier*'s early procedural history does not otherwise differ greatly from the cases described above. The plaintiffs in *Collier* filed a class-action complaint against the defendant in state court, alleging violations of FACTA. *Id.* at *1. Invoking the federal courts' original jurisdiction over claims arising under federal law, the defendant removed the suit to federal court pursuant to 28 U.S.C. §§ 1331 and 1441(a). *Id.* A week later, the defendant filed a Rule 12(b)(1) motion to dismiss, in which it argued that subject matter

jurisdiction was lacking because the plaintiffs did not allege an injury in fact sufficient to confer Article III standing. *Id.* The plaintiffs then moved to remand the case to state court on the ground that the defendant failed to meet its burden to establish subject matter jurisdiction. *Id.* The district court denied the plaintiffs' motion for remand, reasoning that because the case arose under federal law, it had original jurisdiction pursuant to 28 U.S.C. § 1331 and removal was proper. *Id.* The district court went on to evaluate whether the plaintiffs had standing. *Id.* The district court agreed with the defendant that the plaintiffs' complaint failed to set forth an adequate injury in fact for standing purposes and dismissed the suit for lack of subject matter jurisdiction, with leave to amend. *Id.* Because the plaintiffs did not amend their complaint, the district court ultimately dismissed the case with prejudice. *Id.*

On appeal, the plaintiffs argued that the district court erred in dismissing the case rather than remanding it to state court. *See* Appellants' Br. at 5, *Collier*, 2018 WL 2186786 (No. 17-2431). The plaintiffs argued that under 28 U.S.C. § 1447(c), the district court was required to remand the case once it determined that subject matter jurisdiction was lacking. *See id.* at 8-10. The plaintiffs also argued, however, that the district court was compelled to remand the case based solely on the defendant's failure to meet its burden to establish subject matter jurisdiction—the same argument made by the plaintiffs in the present case. *Id.* at 10-13. Despite the plaintiffs' invitation to do so, the Seventh Circuit did not hold that remand was warranted simply because the defendant, upon whom the burden of establishing federal jurisdiction clearly rested, failed to meet that burden with respect to establishing Article III standing. Instead, notwithstanding the fact that neither party argued in favor of finding standing (indeed,

the defendants expressly argued that there was no standing), the Seventh Circuit decided the question of standing for itself, <u>before</u> determining whether dismissal or remand was warranted.  *See Collier*, 2018 WL 2186786, at \*2-3 ("Thus, § 1447(c) required the district court to remand this case to state court, *because it does not satisfy Article III's requirements*.") (emphasis added); *see also Muscarello v. Ogle Cty. Bd. of Comm'rs*, 610 F.3d 416, 425 (7th Cir. 2010) ("[T]he rule in this circuit has been that the court's discretion to dismiss for lack of subject matter jurisdiction when the [party with the burden of proof] could have pleaded the existence of jurisdiction and when in fact such jurisdiction exists, should be exercised sparingly.") (internal quotation marks and citation omitted).

Subject matter jurisdiction has not been expressly challenged in this case.  But because it has been cast into doubt, albeit indirectly, by the defendants' motions to dismiss—and because courts have an independent duty to ensure that jurisdiction exists—the Court will follow the Seventh Circuit's approach in *Collier* by deciding the underlying question of standing prior to determining the propriety of remanding the case to the state court.

To constitute an injury in fact sufficient for Article III standing purposes, a plaintiff's alleged injury must be both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Spokeo*, 136 S. Ct. at 1548 (citation omitted).  Although a concrete injury need not necessarily be a tangible one, it must be "real, and not abstract."  *Id.* (internal quotation marks and citations omitted).  In determining whether a certain intangible harm constitutes a concrete injury in fact, courts are to consider (1) "whether an alleged intangible harm has a close relationship

to a harm that has traditionally been regarded as providing a basis for a lawsuit," and (2) Congress's judgment that a given harm should be elevated to the status of a legally cognizable injury. *Id.* at 1549. Nonetheless, as the Supreme Court explained in *Spokeo*, "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* A plaintiff may not "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.*; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing.").

The Illinois legislature passed the Biometric Information Privacy Act in 2008 in response to concerns about the growing use of biometric identifiers and information in financial transactions and security screening procedures. *See* 740 ILCS 14/5. The legislature explained,

> Biometrics are unlike other unique identifiers that are used to access finances or other sensitive information. For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions.

*Id.* § 14/5(c). For this reason, the legislature determined that the public welfare, security, and safety would be served by "regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information," including fingerprint scans. *Id.* § 14/5(g); *id.* § 14/10. Accordingly, BIPA prohibits private entities from collecting, capturing, purchasing, receiving through trade, or

otherwise obtaining an individual's biometric data unless they first (1) inform the individual in writing that the information is being collected and stored; (2) inform the individual in writing of the specific purpose and period of time for which it is being collected, stored, and used; and (3) receive a written release from that individual. *Id.* § 14/15(b). Private entities in possession of a person's biometric identifier or information may not disclose it to any other entity unless (1) that person consents; (2) the disclosure "completes a financial transaction requested or authorized" by that person; (3) the disclosure is required by law or ordinance; or (4) the disclosure is required pursuant to a valid warrant or subpoena. *Id.* § 14/15(d). BIPA also requires those in possession of biometric identifiers or information to "develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying" such information. *Id.* § 14/15(a). Lastly, BIPA provides that private entities in possession of biometric data must "store, transmit, and protect from disclosure all biometric identifiers and biometric information using the reasonable standard of care within the private entity's industry." *Id.* § 14/15(e)(1).

In this case, in addition to alleging what might accurately be characterized as "bare procedural violations" of BIPA, Dixon also has alleged that Smith disclosed her fingerprint data to Kronos without her knowledge and that the defendants violated her right to privacy in her biometric information—the very right that the drafters of BIPA sought to protect. *See* Compl. ¶¶ 30, 97-98, 100. The Illinois legislature's intent to create a legal right to privacy in personal biometric data and to protect the right to control one's biometric identifiers and information is evident from its statement of legislative findings and intent as well as from the substantive provisions of the Act. *See*

19

740 ILCS 14/5 (explaining that many members of the public are "weary [sic] of the use of biometrics," that "[t]he full ramifications of biometric technology are not fully known," and that biometric information is distinct from other personally identifying information because it cannot be changed if compromised); *id.* § 14/15 (requiring notice and consent to collect, store, use, or disseminate biometric data); *see also U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 763 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person."); *Patel v. Facebook Inc.*, 290 F. Supp. 3d 948, 953-54 (N.D. Cal. 2018) (along with codifying a right of privacy in personal biometric information, BIPA gives Illinois residents "the right to control their biometric information by requiring notice before collection and giving [them] the power to say no by withholding consent").

Invasion of privacy lawsuits are nothing new; at common law, violations of the right to privacy have been recognized as a valid basis for suit. *See Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 488 (1975); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017). Additionally, in determining whether the BIPA violations alleged by Dixon have resulted in a sufficiently concrete injury for standing purposes, the Court considers the fact that the Illinois legislature created a private right of action to enable "[a]ny person aggrieved by a violation of [the] Act" to enforce her rights under the statute. 740 ILCS 14/20. The Illinois General Assembly's considered judgment that a person's right to privacy in and control over her personal biometric data is an interest worth protecting does not, by itself, make any violation of that right a concrete injury, but it is a factor to consider. *See Groshek v. Time Warner Cable, Inc.*, 865 F.3d 884, 886-87 (7th Cir.

2017); *see also Patel*, 290 F. Supp. 3d at 953 ("[T]here is no good reason why the judgment of a state legislature should be treated as less important than that of Congress in deciding when the violation of a statutory grant in itself amounts to a real and concrete injury."); *Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 639 (E.D. Mich. 2017) ("Congress's (or a state legislature's) judgment is ... instructive and important in deciding whether a statutory violation is sufficient to support Article III standing.") (internal quotation marks and citation omitted).

Obtaining or disclosing a person's biometric identifiers or information without her consent or knowledge necessarily violates that person's right to privacy in her biometric information. The allegation that Smith disclosed Dixon's fingerprint data to Kronos without informing her[5] distinguishes this case from others in which alleged violations of BIPA were determined insufficiently concrete to constitute an injury in fact for standing purposes. For example, in *McCollough v. Smarte Carte, Inc.*, No. 16 C 03777, 2016 WL 4077108 (N.D. Ill. Aug. 1, 2016), the plaintiff alleged that the defendant, Smarte Carte, violated BIPA by requiring her to scan her fingerprint for use as a "key" to unlock a rental locker without first providing her with the notice required by the Act and obtaining her consent; the plaintiff did not allege, as Dixon does here, that her fingerprint data was disclosed to or otherwise obtained by a third party. *Id.* at *1, 3. Because the plaintiff did not allege any harm that resulted from these violations, the district court concluded that she had "alleged the sort of bare procedural violation that cannot satisfy Article III

---

[5] Smith's contention that "Dixon does not allege that her biometric information has been . . . disseminated or disclosed by Defendants," Smith's Mem. in Supp. of Mot. to Dismiss (Smith's Mot. to Dismiss) at 2, is incorrect—Dixon has specifically alleged that Smith "fails to inform its employees that it discloses employees' fingerprint data to an out-of-state third-party vendor, Kronos." Compl. ¶ 30

standing." *Id.* at *3-4. Likewise, in *Vigil v. Take-Two Interactive Software, Inc.*, the plaintiffs alleged various BIPA violations in connection with a video game feature that scanned gamers' faces to create personalized avatars for use in the game. *See Vigil*, 235 F. Supp. 3d at 505-08. In deciding that the plaintiffs lacked standing to pursue their claims, the district court specifically noted that the plaintiffs did not allege that the defendant disseminated or sold their biometric data to third parties. *Id.* at 511.

The Seventh Circuit's analysis of the injury-in-fact requirement in *Gubala v. Time Warner Cable* further suggests that, where privacy rights are concerned, the dissemination to a third party of information in which a person has a right to privacy is a sufficiently concrete injury for standing purposes. *Gubala*, 846 F.3d 911-12. In *Gubala*, the plaintiff alleged that the defendant retained his personal information—including his date of birth, social security number, and credit card information—long after he cancelled his subscription to the defendant's cable service, in violation of the Cable Communications Policy Act, 47 U.S.C. § 551(e). *Id.* at 910. The Seventh Circuit agreed with the district court that the plaintiff lacked standing to sue because he did not allege that the violation caused him any concrete injury. *Id.* at 912-13. In doing so, however, the court stated that it was mindful of the plaintiff's contention that a violation of section 551(e) is a violation of a right of privacy. *Id.* at 912. The court explained that if the plaintiff had any reason to believe that the defendant intended to release his information or could not be trusted to retain it, "he would have grounds for obtaining injunctive relief." *Id.* But the court found "no indication of any violation of the plaintiff's privacy" because he alleged neither that the defendant intended to release his information nor that it had "released, or allowed anyone to disseminate, any of [his]

personal information." *Id.* The court therefore concluded that the plaintiff lacked

standing to pursue his claims. *Id.* at 913; *accord, Braitberg v. Charter Commc'ns, Inc.*,

836 F.3d 925, 930 (8th Cir. 2016) (insufficient injury in fact where plaintiff alleged only

that the defendant "violated a duty to destroy personally identifiable information by

retaining [it] longer than the [defendant] should have kept it" but did not allege that the

defendant disclosed the information to a third party or that an outside party otherwise

accessed the data).

Dixon has alleged what the plaintiffs in *McCollough*, *Vigil*, and *Gubala* did not.

Specifically, she has alleged that Smith disclosed her fingerprint scan to Kronos without

informing her or obtaining her consent to do so. The Court concludes that this alleged

violation of the right to privacy in and control over one's biometric data, despite being an

intangible injury, is sufficiently concrete to constitute an injury in fact that supports

Article III standing. *See Patel*, 290 F. Supp. 3d at 954 (alleged violation of BIPA notice

and consent provisions is a concrete injury in fact because it "infringes the very privacy

rights the Illinois legislature sought to protect by enacting BIPA"); *Monroy*, 2017 WL

4099846, at *8 n.5 (plaintiff who alleged invasion of privacy along with procedural BIPA

violations alleged sufficient injury in fact for standing purposes). The fact that Dixon

voluntarily scanned her fingerprint to the biometric time clock Smith required her to use,

just as the plaintiffs in *McCollough* and *Vigil* voluntarily allowed their fingerprints or faces

to be scanned, does not change the Court's conclusion, because there is no indication

that Dixon ever consented to (or even knew about) Smith's subsequent disclosure of her

fingerprint scan to Kronos. *See In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d

262, 273-74 (3d Cir. 2016); *Pavone v. Law Offices of Anthony Mancini, Ltd.*, No. 15 C

23

1538, 2017 WL 1197098, at *4 (N.D. Ill. Mar. 31, 2017) (Kennelly, J.).

Because the Court has determined that the alleged violation of Dixon's right to privacy in her biometric data is a sufficiently concrete injury for Article III standing, it need not, and does not, address whether the other harms alleged by Dixon—namely, "mental anguish" and "informational injury" stemming from defendants' alleged BIPA violations—would qualify as injuries in fact in this context. Finally, the other requirements for Article III standing are met because Dixon's alleged privacy injury is fairly traceable to the BIPA violations alleged, and it may be redressed by at least some of the relief that Dixon seeks.

Having concluded that this Court does not lack subject matter jurisdiction over the case, the Court denies Dixon's motion to remand to state court. The Court also denies Dixon's motion for fees and costs incurred as a result of the removal of the case to federal court, because removal was not improper.

**B.      Motions to dismiss**

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint, not the merits of the plaintiff's claims. *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a motion to dismiss, a complaint need only contain factual allegations sufficient "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). In considering a motion to dismiss, the Court "construe[s] the complaint in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from those allegations in [the plaintiff's] favor." *Wilson v.*

*Price*, 624 F.3d 389, 391 (7th Cir. 2010) (citation omitted).

As a preliminary matter, the Smith defendants have moved to dismiss Smith Village and Smith Crossing as defendants on the ground that Dixon has pled insufficient facts to support any finding of liability against either entity. Dixon has not alleged that she ever worked for Smith Village or Smith Crossing, nor has she alleged other facts that would support a finding of joint liability against either entity on any of her claims. Accordingly, the Court grants the motion to dismiss the complaint as to Smith Village and Smith Crossing. If Dixon believes that she can assert a viable claim against these entities, she may attempt to do so by way of an amended complaint.

### 1.      BIPA claim (count 1)

Both Kronos and Smith argue that Dixon has not alleged an actual injury sufficient to confer a right of action under BIPA. They argue that because BIPA's right of action provision limits the right to sue to "person[s] aggrieved" by a violation of Act, 740 ILCS 14/20, the statute requires plaintiffs to establish some sort of actual harm beyond a "bare procedural violation" or a "purely technical statutory violation[]." *See* Kronos's Mot. to Dismiss at 5; Smith's Mot. to Dismiss at 7. According to the defendants, Dixon is not a "person aggrieved" within the meaning of the Act because she has not alleged that she suffered any actual injury as a result of the alleged BIPA violations. Alternatively (but relatedly), the defendants have asked the Court to strike Dixon's request for liquidated damages under BIPA based on her purported failure to allege actual injury or actual damages.

BIPA provides that "[a]ny person aggrieved by a violation of this Act shall have a right of action in a State circuit court or as a supplemental claim in federal district court

against an offending party."  740 ILCS 14/20.  The statute further provides that, for each negligent violation of the Act, a prevailing plaintiff may recover "liquidated damages of $1,000 or actual damages, whichever is greater," in addition to obtaining other relief such as an injunction.  *Id.* § 14/20.  For each intentional or reckless violation of the Act, the plaintiff may recover the greater of liquidated damages of $5,000 or actual damages.  *Id.*

In this particular case, the question of whether Dixon has alleged an injury sufficient to render her a "person aggrieved" under BIPA overlaps significantly with the Article III standing / injury in fact question, so the Court will be brief.  In addition to alleging procedural violations related to BIPA's notice and consent provisions, Dixon has alleged that the defendants violated her right to privacy in and control over her personal biometric data.  Dixon also has specifically alleged that Smith "fails to inform its employees that it discloses employees' fingerprint data to an out-of-state third-party vendor, Kronos."  Compl. ¶ 30.  It is reasonable to infer from the allegations in the complaint that Kronos obtained Dixon's biometric data without her knowledge or consent.  The Court has already concluded that BIPA established a right to privacy in such information and that obtaining or disclosing a person's biometric data without her consent or knowledge necessarily infringes on the right to privacy in that data.  Even though this may not be a tangible or pecuniary harm, it is an actual and concrete harm that stems directly from the defendants' alleged violations of BIPA.  That makes it sufficient not only for standing purposes, but also for purposes of asserting a claim under BIPA.

The Illinois Appellate Court's decision in *Rosenbach v. Six Flags Entertainment*

*Corp.*, 2017 IL App (2d) 170317, is not to the contrary. *Id.* ¶ 1, *appeal pending* (May

Term 2018). In *Rosenbach*, the plaintiff alleged that the defendants, Six Flags and

Great America, violated BIPA when they scanned her minor son's fingerprint for a Great

America theme park season pass "without properly obtaining written consent or

disclosing their plan for the collection, storage, use, or destruction of his biometric

identifiers or information." *Id.* The plaintiff did not allege that she or her son suffered an

actual injury as a result of the violations; the only injury she alleged was a violation of

section 15(b) of the Act (collection of biometric identifiers without providing the requisite

disclosures or obtaining written consent). *Id.* ¶¶ 10, 15. Rejecting the plaintiff's

argument that a "mere technical violation" of BIPA was sufficient to render a party

"aggrieved" under the Act, the appellate court concluded that, in order to be aggrieved

by a violation of the statute, a plaintiff had to experience some sort of actual injury,

adverse effect, or harm. *Id.* ¶¶ 18-21. As the court explained, "[a]lleging only technical

violations of the notice and consent provisions of the statute, as plaintiff did here, does

not equate to alleging an adverse effect or harm." *Id.* ¶ 21. The court specifically noted,

however, that the plaintiff "did not allege in her complaint any harm or injury to a privacy

right." *Id.* ¶ 20 n. 1. The court also noted that "the injury or adverse effect need not be

pecuniary." *Id.* ¶ 28.

     Because Dixon <u>did</u> allege an injury to a privacy right in her complaint—and

because, as explained above, the Court has concluded that obtaining or disclosing a

person's biometric data without her consent or knowledge constitutes an actual and

concrete injury because it infringes on the right to privacy in that data, this case is

distinguishable from *Rosenbach*.[6]  Finally, although, as the defendants point out, the district courts in both *McCollough* and *Vigil* concluded that the plaintiffs failed to allege injuries sufficient to render them "aggrieved" within the meaning of BIPA, the Court has already explained why those cases are likewise distinguishable from the present case. Additionally, in a ruling by summary order, the Second Circuit vacated the judgment of the district court in *Vigil* insofar as it held that the plaintiffs lacked a statutory cause of action under BIPA as "aggrieved" parties because "the district court's resolution of the issue was a judgment on the merits that could not be properly addressed absent subject matter jurisdiction."  *Santana v. Take-Two Interactive Software, Inc.*, 717 F. App'x 12, 17-18 (2d Cir. 2017).

Because Dixon has alleged an actual and concrete injury to her right to privacy in her biometric data stemming from the defendants' alleged BIPA violations, the Court concludes that she is a "person aggrieved" with a right of action under the statute. Accordingly, the Court denies the defendants' motion to dismiss Dixon's BIPA claim and declines to strike Dixon's request for liquidated damages under BIPA at this early stage in the proceedings.

---

[6] Defendants point out that the Circuit Court of Cook County has subsequently relied on *Rosenbach* to dismiss two similar suits that did allege violations of a privacy right.  *See Rottner v. Palm Beach Tan, Inc.*, No. 15 CH 16695 (Ill. Cir. Ct. Mar. 2, 2018) (Kronos's Notice of Additional Auth. in Supp. of Mot. to Dismiss, dkt. no. 35); *Sekura v. Krishna Schaumburg Tan, Inc.*, No. 16 CH 04945 (Ill. Cir. Ct. Jan. 16, 2018 Order) (Kronos's Reply in Supp. of Mot. to Dismiss, Ex. 1).  The one-page order in *Sekura* is unpersuasive; it merely states that the claim is being dismissed "[f]or the reasons outlined in *Rosenbach*."  *Sekura* (No. 16 CH 04945).  *Rottner* is distinguishable from the present case because the plaintiff in *Rottner* did not allege that the defendant disclosed her biometric data to another party.  *See* 3d Am. Class Action Compl., *Rottner* (No. 15 CH 16695) (Kronos's Notice of Additional Auth. in Supp. of Mot. to Dismiss, dkt. no. 35).

## 2. Negligence claim (count 2)

Defendants also have moved to dismiss Dixon's negligence claim. First, Kronos argues that Dixon has failed to state a claim for negligence because she has not alleged an "extra-statutory" duty of care, and Illinois law does not recognize a common law duty to safeguard personal information. Next, both defendants contend that Dixon also failed to plead any breach of a legal duty or an actual injury proximately caused by such a breach, both of which are necessary elements of a negligence claim. Lastly, Kronos argues that Dixon's failure to plead actual damages provides another basis for dismissal of this claim.

Under Illinois law, "[t]o succeed in a claim for negligence, a plaintiff must establish the existence of a duty, a breach of the duty, and an injury to the plaintiff that was proximately caused by the breach." *Vancura v. Katris*, 238 Ill. 2d 352, 373, 939 N.E.2d 328, 342 (2010). Illinois has not recognized a common law duty to exercise reasonable care to safeguard an individual's personal information. *See Cooney v. Chicago Pub. Sch.*, 407 Ill. App. 3d 358, 363, 943 N.E.2d 23, 28-29 (2010). Nonetheless, a duty may also be created by statute or ordinance. *See, e.g.*, *Bd. of Educ. of Indian Prairie Sch. Dist. No. 204 v. Du Page Cty. Election Comm'n*, 341 Ill. App. 3d 327, 331, 793 N.E.2d 954, 957-58 (2003); *Bier v. Leanna Lakeside Prop. Ass'n*, 305 Ill. App. 3d 45, 58, 711 N.E.2d 773, 783 (1999), *as modified on denial of reh'g* (May 19, 1999); *O'Neil v. Krupp*, 226 Ill. App. 3d 622, 628, 589 N.E.2d 185, 189-90 (1992). Additionally, it is well established that a violation of a statute designed to protect human life or property constitutes *prima facie* evidence of negligence. *Kalata v. Anheuser-Busch Cos., Inc.*, 144 Ill. 2d 425, 434, 581 N.E.2d 656, 661 (1991). A plaintiff injured by

such a violation is entitled to recovery if she shows (1) that the violation proximately caused her injury; and (2) that the statute was "intended to protect a class of persons to which [s]he belongs from the kind of injury that [s]he suffered." *Id.*

Kronos's contention that the Illinois Supreme Court has determined that "a statute precludes a negligence claim unless the claim is based on an 'extra-statutory duty of care'" is not supported by the sole (unpublished) case Kronos cites for that proposition. Kronos's Mot. to Dismiss at 14 (quoting *Bank of Am., N.A. v. Bird*, 2011 IL App (5th) 080188-U ¶ 13). In that case, the Illinois Appellate Court answered only the specific question of whether the Illinois Notary Public Act "exclusively governs the liability of the employer of a notary public and preempts common law theories of recovery," and it actually answered that question in the negative. *Bird*, 2011 IL App (5th) 080188-U ¶¶ 9, 17. In reaching that conclusion, the court noted that the Illinois Supreme Court had recently stated that "the mere existence of a statute establishing legal duties . . . does not foreclose the possibility of a common law negligence action based on an extra-statutory duty of care." *Id.* ¶ 13 (quoting *Vancura*, 238 Ill. 2d at 377, 939 N.E.2d at 344). That statement in no way suggests that a plaintiff must rely on an extra-statutory duty of care in bringing a negligence claim. Nor does *Cuyler v. United States*, 362 F.3d 949 (7th Cir. 2004), which Kronos cites in its reply brief as additional support, persuade the Court that the defendants owe no duty of care to Dixon. The court in *Cuyler* made the observation that "the mere fact that a statute *defines* due care does not in and of itself create a duty enforceable by tort law" in the context of deciding whether a general statutory requirement to report suspected child abuse imposed on the defendants a duty of care toward a particular plaintiff. *Id.* at 951-52 (emphasis in

original).  Although the Seventh Circuit decided that the particular statute at issue in that case did not create a duty to the plaintiff, it recognized that "the legislature can and sometimes does create a duty of care to a new class of injured persons."  *Id.* at 952.

Dixon contends that "BIPA, not the common law, defines the applicable standard of care with regard to the collection, usage, and dissemination of biometric data."  Pl.'s Resp. to Mots. to Dismiss at 14.  As has already been discussed, the Illinois legislature enacted BIPA because it determined that "public welfare, security, and safety [would] be served by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information."  740 ILCS 14/5(g).  BIPA requires private entities in possession of biometric identifiers or information to "store, transmit, and protect from disclosure all biometric identifiers and biometric information using the reasonable standard of care within the private entity's industry."  *Id.* § 14/15(e)(1).  It also prohibits private entities from obtaining a person's biometric data without providing notice and obtaining a written release and prohibits disclosure of that data without consent.  *Id.* §§ 14/15(b), (d).  It is clear from the face of the statute that BIPA was intended to protect individuals whose biometric data is being collected, stored, and used by private entities.  It is also clear that BIPA was intended to prevent the type of injury Dixon alleges here:  the violation of her right of privacy in her biometric data.

In addition to alleging that the defendants either disclosed her biometric data without consent (in the case of Smith) or obtained it without her knowledge (in the case of Kronos), Dixon also has alleged that the defendants breached their duty under BIPA to exercise reasonable care in the collection and use of her biometric data "by failing to implement reasonable procedural safeguards around the collection and use of . . . [her]

biometric identifiers and biometric information." Compl. ¶ 105. She has alleged that this breach proximately caused a violation of her privacy rights. *Id.* ¶ 108. The Court has already concluded that the privacy injury stemming from the alleged BIPA violations is a concrete and actual injury.[7] Dixon therefore has alleged all the elements of a common law negligence claim: the existence of a statutorily-created duty, a breach of that duty, and an actual injury that was proximately caused by that breach. She need not do more than that to survive a motion to dismiss.

### 3. Employment claims (counts 3-6)

The Smith defendants also have moved for the dismissal of all of Dixon's employment-related claims. Dixon has forfeited the opportunity to substantively respond to the arguments for dismissal of these claims; instead of addressing the Smith defendants' arguments on the merits, she merely asserts that the Court should remand her employment claims to state court if it concludes that it lacks subject matter jurisdiction over the BIPA claim. Dixon did not suggest what the Court should do with these claims if it concluded, as it has here, that it does not lack subject matter jurisdiction. The Court must therefore rule on the motion to dismiss Dixon's employment claims without the benefit of any argument on Dixon's behalf.

### a. Claims against individual defendants

As a preliminary matter, the Smith defendants contend that Dixon's claims against the individual defendants, Kevin McGee and Marti Jatis, should be dismissed because Dixon has not alleged facts sufficient to state a plausible claim against them.

---

[7] The conclusion that Dixon's alleged privacy injury constitutes an actual injury eliminates the need to consider whether the other injuries alleged by Dixon (mental anguish and an informational injury) can sustain a claim under a common law negligence theory.

Dixon's complaint states the following with respect to McGee:

> At all times material, Defendant Kevin McGee was the Chief Executive
> Officer of Smith and is an 'employer' as defined by the IMWL, 820 ILCS
> 015/3 [sic], and as defined by the IWPCA, 820 ILCS 115/2. In this
> capacity, McGee had the authority to hire and fire employees, the
> authority to direct and supervise the work of employees, including Plaintiff
> in this case, the authority to sign on corporate checking accounts,
> including payroll accounts, and the authority to make decisions regarding
> wage and hour issues, including the decisions regarding payroll and other
> capital expenditures.

Compl. ¶ 12. In the next paragraph, aside from replacing "Kevin McGee" with "Marti Jatis" and "Chief Executive Officer of Smith" with "Executive Director of Smith Village," Dixon appears to have merely copied the same allegations, down to the typographical error in the citation to the IMWL. *See id.* ¶ 13. Dixon's complaint makes no specific factual allegations with respect to McGee. Aside from referring to Jatis as one of her supervisors and alleging that Jatis was one of the individuals she questioned about the classification of the Environmental Services Manager position as "exempt" from overtime requirements, Dixon does not allege facts from which Jatis's role in the alleged violations may be determined. Because the Court finds that Dixon's conclusory allegations that McGee and Jatis are "employers" within the meaning of the IMWL and the IWPCA are insufficient to support a plausible claim to relief against them—and because Dixon has not made any substantive argument regarding why this Court should not dismiss her claims against McGee and Jatis—the Court grants the motion to dismiss counts 3 through 5 of the complaint as against McGee and Jatis, without prejudice to filing of an amended complaint.

### b.    IMWL claims (counts 3 and 4)

Dixon alleges not only that Smith failed to compensate her for at least 100 hours

of overtime work in violation of the Illinois Minimum Wage Law, 820 ILCS 105/4a, but also that Smith retaliated against her for questioning whether she could be classified as "exempt" from overtime compensation requirements if she accepted the Environmental Services Manager position she was offered. Smith has moved to dismiss both claims on the ground that Dixon failed to allege facts sufficient to conclude that she was not an exempt employee between April 2017 and September 2017 because she did not specify whether she continued to be paid by the hour or received a salary during that time frame.

Dixon's complaint states that "[w]hile [she] worked for Smith, she was an hourly employee earning approximately $16.44 per hour." Compl. ¶ 49. Although Dixon alleges that she was charged with Environmental Services Manager duties beginning around April 2017, she specifically states—twice—that her "title and pay *did not change* as a result of these additional duties." *Id.* ¶ 53 (emphasis added); *see also id.* ¶ 60 ("Smith did not change Plaintiff's title or pay as a result of these additional duties."). It is more than reasonable to infer from these allegations that Smith continued to pay Dixon by the hour, rather than on a salary basis, from April 2017 until her termination in September of the same year. Because Smith makes no other argument in support of its motion to dismiss Dixon's IMWL claims, the Court denies the motion with respect to counts 3 and 4 against Smith.

### c. IWPCA claim (count 5)

Smith further contends that Dixon has failed to state a claim for relief under the Illinois Wage Payment and Collection Act because she has not sufficiently alleged an employment contract or agreement to pay her ongoing, work-related cell phone

expenses.  Specifically, Smith argues that Dixon did not allege that either Ashley

Castro, her supervisor, or Chris August, the Corporate Environmental and Safety

Director, had authority to enter into an employment agreement on behalf of Smith

Senior Living.  Smith also asserts that Dixon did not allege that there was mutual assent

to pay her future cell phone charges.

The IWPCA defines "wages" as "any compensation owed an employee by an

employer pursuant to an employment contract or agreement between the 2 parties."

820 ILCS 115/2.  Under the Act, employers are required to pay all wages earned by an

employee during a semi-monthly or bi-weekly pay period no later than thirteen days

after the end of the pay period in which the wages were earned.  *Id.* § 115/4.

Employers are required to pay separated employees their final compensation in full "at

the time of separation, if possible, but in no case later than the next regularly scheduled

payday."  *Id.* § 115/5.

Dixon has alleged that Castro and August "agreed on behalf of Smith" to

reimburse her for work-related cell phone charges.  Compl. ¶¶ 56, 130.  In accordance

with that agreement, in June 2017, Smith reimbursed Dixon for her cell phone expenses

for the period from April 2017 through June 2017.  According to Dixon, Smith later failed

to comply with the terms of the agreement because it did not reimburse her for work-

related cell phone expenses incurred from July 2017 to September 2017.  Dixon has

alleged that Smith's failure to reimburse her for these charges pursuant to the terms of

their agreement constitutes a violation of the IWPCA.  These allegations are sufficient to

state a plausible claim to relief under the IWPCA.  Smith cites no authority for the

proposition that Dixon's failure to specifically allege that Castro and August had

authority to enter into an employment agreement on Smith's behalf or that the agreement was to reimburse her for "future" cell phone expenses warrants dismissal of her claim. The Court therefore denies the motion to dismiss Dixon's IWPCA claim against Smith.

### d.    Retaliatory discharge claim (count 6)

Lastly, Smith contends that Dixon's retaliatory discharge claim fails as a matter of law because the tort of retaliatory discharge does not protect employees from being terminated for challenging whether they may be classified as an exempt employee in a certain salaried position.

The Illinois Supreme Court recognizes a "limited and narrow tort of retaliatory discharge as an exception to the general rule of at-will employment." *Jacobson v. Knepper & Moga, P.C.*, 185 Ill. 2d 372, 376, 706 N.E.2d 491, 492 (1998). To prevail on a claim for retaliatory discharge, the plaintiff must show (1) that she was discharged; (2) in retaliation for her activities; and (3) that the discharge "violates a clear mandate of public policy." *Blount v. Stroud*, 232 Ill. 2d 302, 314, 904 N.E.2d 1, 9 (2009). Although there is "no precise definition of what constitutes clearly mandated public policy," Illinois courts have recognized retaliatory discharge claims in two types of situations. *Michael v. Precision All. Grp., LLC*, 2014 IL 117376, ¶ 30, 21 N.E.3d 1183, 1188. The first is when an employee is discharged in retaliation for asserting her right to file a workers' compensation claim. *See Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 384 N.E.2d 353 (1978). The second is when an employee is discharged for engaging in whistleblowing conduct. *See Palmateer v. Int'l Harvester Co.*, 85 Ill. 2d 124, 421 N.E.2d 876 (1981). The Illinois Supreme Court has repeatedly expressed a disinclination to expand the tort

of retaliatory discharge. *See Metzger v. DaRosa*, 209 Ill. 2d 30, 44, 805 N.E.2d 1165, 1173 (2004) ("[T]his court has consistently sought to restrict the common law tort of retaliatory discharge.").

Dixon's retaliatory discharge claim appears to be based on her belief that she was terminated in retaliation for questioning whether she would qualify as an exempt employee as an Environmental Services Manager making a salary of $43,000 a year, even though this allegation also serves as the basis for a separate retaliation claim under the IMWL. Dixon asserts in the complaint that a clear mandate of public policy prohibits an employer from discharging an employee "for inquiring about or asserting one's rights under Illinois law," though she cites no authority for this broad proposition. Compl. ¶ 137.

Dixon has alleged only that, when offered the Environmental Services Manager position, she sent an e-mail to her supervisors, Castro and Jatis, "challenging whether the offered salary complied with the salary threshold established by the federal government to properly classify employees as 'exempt.'" Compl. ¶ 68. The Court does not believe that this e-mail, without more, could be considered "whistleblowing" activity. In light of Illinois courts' narrow interpretation of the retaliatory discharge tort and Dixon's failure to respond to Smith's motion to dismiss this claim, the Court agrees that Dixon's retaliatory discharge claim should be dismissed.

### Conclusion

For the foregoing reasons, the Court denies plaintiff's motion to remand [dkt. no. 27] and denies Kronos's motion to dismiss or, in the alternative, strike plaintiff's request for liquidated damages [dkt. no. 16]. On the Smith defendants' motion to dismiss, the

Court dismisses Smith Village and Smith Crossing as defendants with respect to all counts of the complaint; dismisses counts 3 through 5 as against McGee and Jatis without prejudice; dismisses Dixon's retaliatory discharge claim (count 6); and otherwise denies the motion [dkt. no. 19]. The case is set for a status hearing on June 7, 2018 at 8:30 a.m. for the purpose of setting a discovery and pretrial schedule and discussing the possibility of settlement.

_____

MATTHEW F. KENNELLY
United States District Judge

Date: May 31, 2018